IN THE COURT OF COMMON PLEAS
KNOX COUNTY, OHIO

FILED
KNOX COUNTY
COURT OF COMMON PLEAS

2004 NOV -9 AM 10: 33

MARY JO HAWKINS
CLERK OF COURTS

Thomas Burr
13004 New Delaware Road
Mount Vernon, Ohio 43050

and

Marie Stamp
13004 New Delaware Road
Mount Vernon, Ohio

Plaintiffs

v.

Andrew N. Burns
90 W. College Street
Fredericktown, Ohio 43019

and

Bethany J. Marti
780 Upper Fredericktown Road
Mount Vernon, Ohio 43050

and

The City of Mount Vernon
40 Public Square – Suite 206
Mount Vernon, Ohio 43050

Defendants

Case No.

Judge: Otho Eyster

**AMENDED COMPLAINT**

**JURY DEMAND ENDORSED HEREON**

Now comes Thomas Burr (hereinafter "Burr") and Marie Stamp (hereinafter "Stamp") by and through undersigned counsel, who do allege and aver as follows:

1. Burr is an individual, age 25, residing at 13004 New Delaware Road, Mount Vernon, Ohio.

1



DLB

2. Stamp is an individual, age 18, residing at 13004 New Delaware Road, Mount Vernon, Ohio.

3. Bethany Marti ("Marti") is an individual residing at 780 Upper Fredericktown Road, Mount Vernon, Ohio 43050.

4. Andrew N. Burns ("Burns") is an individual residing at 90 W. College St., Fredericktown, Ohio 43019.

5. The City of Mount Vernon, Ohio is a duly organized municipal corporation and political subdivision of the State of Ohio.

6. At all times relevant hereto, Burns and Marti were police officers of the Mount Vernon Police Department.

7. At all times relevant hereto, Burns and Marti were acting within their scope of their employment as a police officers and as employees of the City of Mount Vernon, Ohio.

8. At all times relevant hereto, the City of Mount Vernon, Ohio had a legal duty to adequately train and supervise Burns and Marti as its employees, to insure that Burns and Marti carried out their duties as police officers in a lawful manner.

9. In the early morning hours of August 3, 2004, circa 1:30 a.m., Burr and Stamp were travelling on foot within the City of Mount Vernon, Ohio, en route to an apartment located on Follin Avenue, to which Stamp had a key given to her by the lawful occupant.

10. On this warm summer evening, Burr was lightly attired in shoes, socks, blue jeans and a blue sleeveless tank shirt.

2

11. On this warm summer evening, Stamp was lightly attired in shoes, socks, plastic sweat pants and a sports bra.

12. As Burns and Stamp entered the complex of apartments from Taylor Road in the darkness of night, they were confronted by an individual, initially unknown to them, possessing a flashlight.

13. They later learned this individual was police officer Andrew N. Burns.

14. Initially, due to darkness of night, neither Burr nor Stamp could see this individual clearly.

15. Burns, without identifying himself as a police officer, repeatedly commanded both of them to drop to the ground, in rapid-fire succession, in a loud and authoritative voice.

16. While so commanding Burr and Stamp, Burns pointed his flashlight so that the light of it shone into the face of Burr.

17. As a consequence of this, Burr was blinded by the flashlight of Burns, and unable to clearly see Burns.

18. As a consequence of not knowing the identity of the individual commanding him to get on the ground, Burr repeatedly asked "Who are you?".

19. Instead of identifying himself as a police officer, Burns again and again commanded both Burns and Stamp to "Get on the ground, now."

20. Unblinded by the direct focus of the flashlight, Stamp was eventually able to ascertain that the person commanding her to drop to the ground wore a badge, and had a pistol drawn upon her.

3

21. Believing therefore that the unidentified individual commanding her to get on the ground was more likely than not a police officer, and unwilling to risk the consequences of being shot for failure to comply, Stamp, in an abundance of caution, dropped to the ground, on her hands and knees, upon hearing Burns' fourth command to drop to the ground.

22. Burr, however, still blinded by the flashlight, upon hearing the fourth command to drop to the ground, persisted in inquiring as to the identity of Burns.

23. The as-of-yet unidentifiable individual responded to Burr's sixth inquiry with the response that he was "the police" - "get on the ground, now!"

24. Burr was unpersuaded, since he was still unable to see the person commanding him to drop to the ground.

25. Burr has several friends and acquaintances residing in the apartment complex who he believed would not be above pulling a prank on him with a flashlight in his eyes, just to see if he dropped to the ground.

26. Accordingly, Burr asked "What police?" in an effort to again hear the voice of the person again commanding him to drop to the ground, in hopes that he might recognize the voice.

27. Simultaneously, in an abundance of caution, he raised both arms above his head and moved his head from side to side in an effort to avoid the direct glare of the flashlight in his eyes, so that he might see whether the person giving the commands was, in fact, an officer of the law or a devilish prankster.

4

28. To Burr's inquiry of "What police?" Burns responded with "Mount Vernon Police - get on the ground now!"

29. Burr then realized that Stamp was no longer walking beside him, but was instead on the ground a short distance behind him.

30. Burr therefore began to drop to the ground, and as he did so, escaped the glare of the flashlight long enough to be in a position to ascertain that the person holding the flashlight was dressed as a Mount Vernon Police Officer, and held a drawn weapon.

31. Accordingly, Burr dropped to his hands and knees and watched as Burns approached him.

32. As Burns neared Burr, he commanded Burr to lay all the way flat on his belly upon the ground and Burr did so.

33. Burns proceeded to interrogate Burr and Stamp as to who they were.

34. The ground upon which Burr lay belly-down was wet, and his shirt and pants were getting wet.

35. Accordingly, while Burns was behind him and nearer to Stamp than to him, Burr said to Burns "I'm getting wet, can I get upon my hands and knees?" While asking this question, Burr raised himself up from the ground slightly. Burns forced Burr back down flat to the ground by placing his knee into Burr's back with great force. Burr asked Burns to remove his knee, and to allow him to stay on the ground, only on his hands and knees.

36. Burns gave him permission to do so.

5

37. Burns then went behind Burr, nearer to Stamp, as he continued the interrogation of both.

38. While responding to one of the questions from Burns, Burr thereafter turned his head to face Burns, and in the process lifted one of his hands so that the palm was no longer touching the ground, and only his finger tips were touching the ground.

39. This action apparently agitated Burns considerably for, in response thereto, Burns returned to Burr's immediate vicinity, complaining that Burr had failed to keep his hands on the ground, and commanded Burr to place his hands behind his back.

40. Burr complied and was handcuffed.

41. Soon thereafter, Officer Marti arrived on the scene, followed by Officer Mark Perkins. The officers proceeded to berate Burr and Stamp for almost getting themselves shot.

42. Officer Marti handcuffed Stamp shortly after her arrival.

43. Officers Perkins and Marti assisted Stamp to her feet, and Officer Marti took Stamp to a nearby police cruiser, placing her in the back seat.

44. Officer Marti interrogated Stamp.

45. Stamp truthfully told Marti that they had been driving a friend's car in Columbus, Ohio, so that Burr could meet Stamp's mother, when the car broke down. The friend lived on Hamtrammck Street in Mount Vernon, They had the car towed from Columbus, Ohio to the friend's house. They rode home in the tow truck. They then set out on foot to the Follin Avenue apartments, to either sleep for the

6

night at the apartment of the friend, or secure a ride from a friend to Burr's house on New Delaware Road, west of town.

46. Soon thereafter, Burr was escorted to the same cruiser by Officers Perkins and Burns, and placed in the back seat of the cruiser. As soon as Burr was seated in the cruiser, Stamp was removed.

47. Still handcuffed, Marti seated Stamp on a nearby curb while Burns and Officer Perkins drove off with Burr.

48. After the passage of approximately 20 minutes, Marti was advised by radio communication to release Stamp, and she did so by removing the handcuffs.

49. Marti then escorted Stamp to the doorstep of an apartment within the Follin Avenue complex. After Stamp used a key to unlock the door and entered the apartment, Officer Marti departed from the area.

50. Meanwhile, Burr was transported in the police cruiser by Officers Burns and Perkins to the Mansfield Avenue side of the cemetery, where he was removed from the cruiser, in handcuffs, and placed in a position where a high intensity spotlight, attached to the cruiser, was pointed into his eyes. He was ordered to remain motionless.

51. Burr complied with this instruction and was unable to see what next occurred due to the spotlight in his eyes.

52. However, Burr overheard one of the officers ask an unidentifiable individual whether Burr was "the one" and "is this him?", or words to that effect.

53. The unidentified person then responded in a male-sounding voice "no, he is not the one."

54. Burr was returned then to the back seat of the cruiser and administered a breathalyzer test by Officer Burns, which Burr passed.

55. From there he witnessed another young white male in handcuffs being released by the police.

56. Then Burr was again removed from the cruiser and partially uncuffed.

57. Burr was ordered by the Police to remove his shirt and Burr complied.

58. Again, the spotlight was shone into Burr's eyes, blinding him, and a white male was asked "is this him?," to which the white male said "No, it's not him" and "you showed me him before."

59. Whereupon, Burr was ordered to put his shirt back on and complied.

60. Whereupon Burr was again fully handcuffed and placed back into the cruiser.

61. At this point, Thomas Burr expected to be released by the police as he was obviously not the individual they were seeking.

62. Contrary to his expectations however, Burr was advised by Officer Burns that he was being taken to jail for a probation violation of failure to comply with an order of a police officer.

63. Burr was taken to the County Jail and incarcerated by approximately 3:00 a.m. August 3, 2004.

64. Burr was not charged with any crime while incarcerated.

8

65. Burr remained incarcerated at the County Jail until approximately 11:00 a.m. on August 4, 2004, a span of approximately 32 hours.

66. At no time was Burr taken before a Court for a bail hearing.

67. While in custody, Burr was ordered to give two urine samples and complied for purposes of drug use/alcohol use detection.

68. Burr was advised that he passed this alcohol/drug test.

69. While in custody, Burr was not authorized to call his attorney.

70. While in custody, Burr was given no explanation for his detention, except that he was in custody for a probation violation.

71. Burr has never been charged with a probation violation of any kind arising out of the events of the morning of August 3, 2004.

72. To this day, none of his jailers, nor Officers Burns, Marti, or Perkins has apologized to Thomas Burr for his incarceration.

73. Subsequent to release from incarceration, Burr has obtained a copy of the radio communications between police headquarters and the public and Officers Perkins, Burn and Marti for the morning of August 3, 2004.

74. Based thereon, it is apparent that at approximately 1:15 a.m., Ralph Baker called police headquarters to report loud voices coming from the direction of the cemetery near Sunset Street In Mount Vernon, Ohio. When asked, Mr. Baker denied having seen anyone involved.

9

75. Officer Mark Perkins investigated the complaint of Mr. Baker and thereafter advised that he had a suspect in custody, and that another shirtless male was seen running into the cemetery.

76. Perkins asked Officer Marti to take up a position at the Wooster Road entrance to the cemetery, to assist in the apprehension of this shirtless male.

77. Officer Perkins asked Burns to take up a position on Taylor Road to assist in the apprehension of this shirtless male suspect.

78. The shirtless male sought by Officer Perkins was identified as being Ted Layler.

79. When Burns first shone the flashlight upon Thomas Burr, Burns knew, or should have known, that (1) Burr was not Ted Layler; (2) Burr was not shirtless; and (3) Burr was not out of breath from running through the cemetery.

80. When Burns drew his weapon and ordered Stamp to drop to the ground, he knew, or should have known: (1) she was not shirtless; (2) she was not male; (3) she was not Ted Layler; and (4) she was not breathless from running through the cemetery.

81. Plaintiffs repeat all allegations heretofore made in paragraphs 1 through 80.

82. By ordering Stamp to the ground at gunpoint, Officer Burns unlawfully assaulted her.

83. By ordering Stamp to the ground at gunpoint, Officer Burns unlawfully arrested and imprisoned her.

84. By handcuffing Stamp, Officer Marti unlawfully battered and imprisoned her.

85. By ordering Stamp to the ground at gunpoint, Officer Burns caused her to fear imminent and substantial injury, placing her in fear of her life. Accordingly, Officer Burns intentionally inflicted emotional distress upon her.

86. By falsely and unlawfully arresting her and imprisoning her, Officer Burns and Officer Marti intentionally violated her constitutional rights under Article One, Section 1.14 of the Ohio Constitution.

87. Officer Burns' and Officer Marti's arrest and imprisonment of Stamp was made without a valid warrant for her arrest.

88. The arrest and imprisonment of Stamp by Officers Burns and Marti was without justification arising out of the commission of a felony or misdemeanor in the presence of Officers Burns or Marti or any other police officer or complaining citizen.

89. Officer Burns and Officer Marti acted without probable cause in arresting and imprisoning Stamp.

90. The conduct of Officer Burns and Officer Marti toward Stamp was an outrageous affront to her dignity and in total derogation of her rights as a citizen.

91. Plaintiffs repeat all allegations made in paragraphs 1 through 90 as if fully rewritten herein.

92. By ordering Burr to the ground at gunpoint, Officer Burns falsely arrested and imprisoned Burr.

93. By ordering Burr to the ground at gunpoint, Officer Burns unlawfully assaulted Burr.

11

94. By ordering Burr to the ground at gunpoint, Officer Burns placed Burr in fear of death or serious physical injury, and thereby Officer Burns intentionally inflicted emotional distress upon Burr.

95. By placing his knee upon the back of Burr and handcuffing him, Officer Burns unlawfully battered and imprisoned Burr.

96. By causing Burr to be incarcerated after the witness on Mansfield Street failed to identify Burr, Officer Burns falsely imprisoned Burr.

97. By his conduct toward Burr as above described, Officer Burns intentionally violated Burr's rights under Article One, Section 1.14 of the Ohio Constitution.

98. Officer Burns' arrest and imprisonment of Burr was made without a valid warrant for the arrest of Burr.

99. Officer Burns' arrest and imprisonment of Burr was without justification arising out of the commission of a felony or misdemeanor in the presence of the arresting officer, or any other police officer, or complaining citizen.

100. Officer Burns acted without probable cause in arresting and imprisoning Burr.

101. Officer Burns' conduct toward Burr was an outrageous affront to his dignity and in total derogation of his rights as a citizen.

102. By failing to charge Burr with a crime during the 32 hours he was incarcerated, or otherwise causing Burr to be charged with a specific violation of the terms of his probation, Officer Burns acted unlawfully to prolong the wrongful incarceration of Burr.

12

103. The actions of Officers Burns and Marti toward Plaintiffs, as detailed above, were performed out of malice, ill will, in bad faith, or in a wanton and reckless manner.

104. The conduct of Defendants Burns and Marti toward Plaintiffs as detailed above was not required by law or authorized by law; nor was their conduct necessary or essential to the exercise of the police powers of Defendants.

105. Defendants Burns and Marti, in their conduct toward Plaintiffs, as detailed above, were not engaged in the performance of a judicial, quasi-judicial, prosecutorial, legislative or quasi-legislative function; nor were they engaged in the exercise of policy-making, planning or enforcement powers.

106. Plaintiffs, at the time of the conduct of Defendants Burns and Marti, set forth above, were not serving a sentence, or any part thereof, by performing community service, or community work.

107. Defendants Burns and Marti, at the time of the conduct toward Plaintiffs detailed above, were not engaged in the exercise of job-related discretion or judgment in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities or other governmental resources.

108. Defendants Burns and Marti, at the time of their conduct toward Plaintiffs as detailed above, were within the scope of their employment as police officers of the City of Mount Vernon, Ohio, and official responsibilities.

109. Plaintiffs repeat and renew all allegations heretofore made in paragraphs 1 through 108 as if fully rewritten herein.

13

110. The City of Mount Vernon, as the employer of Officer Burns and Officer Marti, is financially responsible for the misconduct of its employees Officers Burns and Marti toward Stamp and Burr, under the doctrine of respondeat superior.

111. The City of Mount Vernon failed in its duty to adequately train and supervise Officer Burns and Officer Marti so as to prevent their mistreatment of Burr and Stamp.

112. The City of Mount Vernon failed in its duty to adequately train and supervise Officer Burns and Officer Marti so as to prevent, preclude and prohibit them from:

(A) Drawing a weapon upon Burr and Stamp without adequate justification;

(B) Ordering Burr and Stamp to the ground without adequate justification;

(C) Handcuffing Burr and Stamp without adequate justification;

(D) Immobilizing and detaining Burr and Stamp without adequate justification;

(E) Imprisoning Stamp and Burr without adequate justification;

(F) Incarcerating Burr without adequate justification;

(G) Infringing upon the constitutional rights of Burr and Stamp pursuant to Article 1, Section 1.14 of the Ohio Constitution, and the 4th, 8th and 14th Amendments to the U.S. Constitution, without adequate justification'

(H) Prolonging the unlawful incarceration of Thomas Burr by failing to charge him with a crime or with a specific violation of the terms of his probation.

113. Plaintiffs repeat and renew all allegations heretofore made in paragraphs 1 through 112 as if fully rewritten herein.

14

114. Defendants Burns and Marti conspired together for the purpose of impeding, hindering, obstructing or defeating the due course of justice in the State of Ohio with intent to deny Plaintiffs of the equal protection of the laws, and with the intent to injure Plaintiffs for lawfully enforcing their rights to equal protection of the laws, in that Defendants Burns and Marti, pursuant to the conspiracy, caused the Plaintiffs to be unlawfully arrested, threatened at gunpoint, assaulted, detained, imprisoned, battered and harassed.

115. Said acts by Defendants constitute violation of 42 U.S.C. Section 1983, and the 4th, 8th and 14th Amendments of the U.S. Constitution.

116. Said acts by Defendants Burns and Marti were proximately caused by certain customs and policies of the City of Mount Vernon, including, but not limited to, its failure to adequately train and supervise its police officers, and its failure to adequately discipline its police officers.

117. Said acts of Defendants Burns and Marti were approved, ratified or adopted by the City of Mount Vernon, Ohio.

118. Wherefore, Plaintiff Stamp prays this Court award damages in an amount to be proved at trial against Officer Burns and Officer Marti and the City of Mount Vernon, Ohio, jointly and severally, of:

   (A) Not less than $25,000 for her claims against Defendants due to false arrest and false imprisonment;

   (B) Not less than $25,000 for her claims against Defendants for intentional infliction of emotional distress;

15

(C) Not less than $25,000 for her claims against Defendants for assault;

(D) Not less than $25,000 for her claims against Defendants for battery;

(E) Not less than $25,000 against Defendants for violation of her constitutional rights pursuant to Article One, Section 1.14 of the Ohio Constitution;

(F) Not less than $25,000 against Defendants for their violation of 42 USC 1983;

(G) Exemplary damages in an amount of not less than $100,000 against each Defendant;

(H) That Defendants be ordered to pay all costs of this action; and

(I) Defendants be ordered to pay all reasonable attorney fees incurred by Plaintiffs in connection with this action.

119. Wherefore, Plaintiff Burr prays this Court award damages in an amount to be proved at trial against Officer Burns and the City of Mount Vernon, Ohio, jointly and severally, of:

(A) Not less than $25,000 for his claims against Defendants due to false arrest and false imprisonment;

(B) Not less than $25,000 for his claims against Defendants for intentional infliction of emotional distress;

(C) Not less than $25,000 for his claims against Defendants for assault;

(D) Not less than $25,000 for his claims against Defendants for battery;

(E) Not less than $25,000 against Defendants for violation of his constitutional rights pursuant to Article One, Section 1.14 of the Ohio Constitution;

(F) Not less than $25,000 against Defendants for their violation of 42 USC 1983;

(G) Exemplary damages in an amount of not less than $300,000 against each Defendant; and

(H) That Defendants be ordered to pay all costs of this action; and

(I) Defendants be ordered to pay all reasonable attorney fees incurred by Plaintiffs in connection with this action.

Respectfully submitted,

_____
Phillip D. Lehmkuhl (0021246)
Attorney for Defendants Thomas Burr and
Marie Stamp
100 North Main Street
Suite 100
Mount Vernon, Ohio  43050
Telephone:   (740)  393-2788
FAX:              (740)  393-2786

17